UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In re:   CONSTANCE S. ELLIS,                        Case No. 11-30195
                                                    Chapter 12
                   Debtor.

APPEARANCES:

Office of the Chapter 12 Standing Trustee,          Lynn Harper Wilson, Esq.
Mark W. Swimelar                                    Staff Attorney
250 South Clinton Street, Suite 203
Syracuse, New York 13202


Getnick, Livingston, Atkinson & Priore, LLP         Patrick G. Radel, Esq.
Attorneys for NBT Bank, National Association
28 East Main St., Ste. 1800
Rochester, NY 14614


Peter A. Orville, P.C.                              Peter A. Orville, Esq.
Attorney for Debtor
30 Riverside Drive
Binghamton, NY 13905

HON. MARGARET CANGILOS-RUIZ, U.S. BANKRUPTCY JUDGE

## MEMORANDUM-DECISION AND ORDER DENYING PLAN CONFIRMATION AND GRANTING STAY RELIEF

On April 27, 2012, this court conducted an evidentiary hearing on confirmation of Debtor Constance S. Ellis's contested, second amended chapter 12 plan that was filed on July 29, 2011 (Doc. No. 37) ("Plan")[1]. Objections to confirmation of the Plan were filed by NBT Bank (at Doc. 41 and 45), the Trustee (at Doc. 74), and a limited objection was asserted by the Farm Service Agency as to the order of priority of its secured claim, all of which remain pending. Returnable at the same time as the hearing on confirmation was

---

[1] The Debtor's original chapter 12 plan filed on May 12, 2011 was denied confirmation at a hearing held on June 14, 2011.

1

NBT Bank's motion for relief from stay that had originally been filed on March 1, 2011. This motion, which was the subject of two interim orders pursuant to which Debtor has been making monthly adequate protection payments of $1,000 to NBT Bank, has tracked the confirmation process, subject to a final consensual resolution by the parties or determination by the court.

The court finds that Debtor has not met the requirements for a confirmable plan. As such, the court denies confirmation of Debtor's second amended chapter 12 plan and grants NBT Bank's motion for relief from the automatic stay. This memorandum-decision, which incorporates the court's findings of fact and conclusions of law, addresses both the contested confirmation and NBT Bank's stay relief motion.

## Factual Background[2]

The Debtor filed the present chapter 12 proceeding on February 11, 2011. The filing was prompted by a foreclosure proceeding commenced by NBT Bank against four parcels of real property in southern Onondaga County owned by the Debtor jointly with her former husband, Richard Ellis ("Property"). The Property serves as security for loans extended by NBT Bank to the Debtor and her former husband. Richard Ellis has since been discharged of his personal liability on the debts as a result of a discharge entered in an individual, chapter 7 bankruptcy proceeding which he recently filed. At the time this case was filed, NBT Bank asserts it was owed $756,024.55. Of the total claim amount, the Debtor and NBT have stipulated that NBT Bank is secured to the extent of $576,622.54. The Property, which totals approximately 153 acres, consists of the

---

[2] These facts are derived from a Joint Stipulation of Facts agreed to by the Debtor and NBT Bank(Doc. 70), the record of the evidentiary hearing conducted by the court, and the filings in this case.

2

following four parcels: 1) Debtor's principal residence and farmland ("Residence"); 2) 132.46 acres of farmland ("Farmland Parcel"); 3) Additional residence ("Residence 2"); and 4) 2.77 acre farm parcel improved by a barn ("Small Farm Parcel"). In addition to NBT Bank's secured claim, Farm Service Agency has a mortgage against Parcels 1 and 2 and has subordinated its position only as to $98,000 of NBT Bank's claim. As of the filing of Debtor's petition, the Agency's secured claim was $39,547.17.

The Property was previously owned by Debtor's grandparents who ran a dairy farm. In 1988, after the Debtor's grandfather died, the Debtor, together with her then husband and three children, moved onto the property with Debtor's grandmother, who deeded the Property the following year to the Debtor and her husband. The Debtor worked the farm, acquired equipment and expanded the herd from 18 cows to upwards to 143 cows with loans borrowed from NBT Bank. The Debtor acquired additional acreage and had a new pole barn built. The Debtor also acquired Residence 2 with the intention to renovate and resell it. By January 2007, however, the Debtor's marriage was beginning to fail and Debtor was deprived of her husband's outside source of income on which the family depended to meet living expenses. Combined with the plummeting of milk prices, the Debtor became unable to timely make payments to NBT Bank and the loans went into default. The Debtor continued her milking operations until January 30, 2009, when the Debtor's cows and farm equipment were sold and the proceeds paid to NBT Bank. The Debtor testified that at the time that her cows and equipment were sold, it was always her intention to continue farming.

From the time her cows and equipment were sold and continuing up through the filing of her petition on February 11, 2011, the Debtor's household income has consisted

of: 1) wages paid for working on a neighboring farm in which the Debtor has been actively engaged full-time; 2) rental income for leasing farmland to another farmer; 3) food stamps; and 4) SSI benefits paid to her 31 year old dependent daughter. At the time of filing for bankruptcy protection, the Debtor's sworn schedules affirmatively state that the Debtor had no livestock or farm equipment. The Debtor's 2008 tax return reflects that the Debtor in 2008 had $121,709 of gross income from farming and an overall net loss of $ -70,499, after accounting for $192,208 of associated expenses (Exhibit 6). Debtor's 2009 return reflects the sale of the Debtor's cows and equipment, gross farming income of $7,146 (net, $ -21,690) and wages paid to the Debtor of $4,255 (Exhibit 7). For tax years 2010 and 2011, the Debtor reported wages, respectively, of $20,564 and $26,447 and no farm income. (Exhibits 8 & 9).

The Debtor's Plan proposes to pay NBT Bank 5% interest on its secured debt over a 30 year period. NBT Bank's secured debt is proposed to be reduced by an anticipated lump sum payment of $112,000 upon the sale of Residence 2 within one year, as are $6,400 of the $24,200 of estimated real property taxes. The secured claim of the Farm Service Agency is proposed to be paid over 30 years at 4% interest. The Plan proposes payment of the Trustee's commission (6%) and the balance of legal fees ($839) in full and a payment of 1% on unsecured claims.

Initially, the Debtor intended in this chapter 12 proceeding "to raise replacement heifers, grow my own crops to feed them and eventually get the farm back to the way it was." (Affidavit of Constance Ellis sworn to on May 11, 2011 at Doc. 19). Then, during the pendency of this chapter 12 proceeding, the Debtor, through her association with a neighboring farmer, Andy Hourigan, became involved in the harvesting of pumpkins.

4

Hourigan laid out the money for the planting operation -- for the seeds and spray to control pests -- and planted the crop on two acres of the Debtor's tillable land. The Debtor harvested the crop, for which she was paid $4,000 by Hourigan, after he sold the pumpkins at wholesale. Based upon this experience, the Debtor has devised a plan to plant 14 acres of pumpkin and an acre of field corn on her land, harvest and market the crop herself and keep the proceeds. Three of the fourteen acres are planning to be devoted to a new, variegated pumpkin variety which the Debtor testified is unique and which she believes can be sold for a higher price. In addition, the Debtor testified that she plans to purchase 100 to 200 mums at $2.00 to $4.00 a piece which she intends to sell directly to the consumer at a 100% markup for $4.00 to $8.00 each. Based upon Debtor's receipt of $4,000 for the two acres of pumpkins which she harvested for Hourigan, Debtor has projected what she characterizes as a conservative estimate of $28,000 as the revenue to be realized from this intended farming operation.

The Debtor proposes to fund her plan with the following funds: $25,000 per year from the above, anticipated farming revenue, $5,000 annually from her anticipated tax refunds, $8,500 from annual property rental income (based upon receiving $100 an acre), proceeds from the sale of Residence 2, Debtor's wages, SSI benefits received on behalf of her daughter, and expected payments from a neighboring property owner for water usage.[3] Debtor offered oral testimony at the hearing that her neighbor, without her prior knowledge or permission, has been irrigating his orchard with water from her property for years and that she expects to be reimbursed for his water usage. Although a final agreement has not been reached, the Debtor is expecting the neighbor to pay her $50,000

---

[3] The funding sources to support the Plan are derived from the Plan, the Joint Stipulation of Facts (Doc. 70) and the testimony of the Debtor at the hearing on confirmation.

for his past water usage and $2,000 a year to continue to utilize the water on her land. The Debtor expects to receive the $50,000 over time by the neighbor assuming payment of Debtor's ongoing real property taxes until the $50,000 is paid down. The Debtor also testified that she has an uncashed $15,000 check payable to herself and her former husband from a gas lease on the Property.

The Debtor was the only witness to testify in support of confirming her plan. There was no independent evidence to support Debtor's estimates of net revenue from her anticipated farming venture. Nor was independent evidence presented to support the value to be realized from the sale of Residence 2, even though nine of the twelve months had passed within which the property was to be sold as anticipated on the date that the Plan was proposed. Debtor testified that she received an offer on the property for $118,000 but no written contract was produced. There is no independent evidence before the court that the hoped-for infusion of funds in payment of the neighbor's water usage will be forthcoming. The Plan, dated July 29, 2011, addresses $24,200 of outstanding taxes. Yet, the testimony established that during the pendency of this proceeding, the Debtor has not paid the September, 2011 school taxes nor the January, 2012 real property taxes, which further encumber the Property. Finally, the Debtor offered no evidence that the proposed length of term (30 years) for repaying NBT Bank's secured debt and proposed interest rate (5%) comport with market standards for customary repayment of agricultural debt under similar circumstances.

NBT Bank presented the testimony of Mary Pulver who is a vice president at NBT Bank and has been involved in agricultural lending and financial related services since 1980. Ms. Pulver, who has been in the lending group underwriting loans to farmers

and has worked with agricultural credits in financial distress, was qualified as an expert. Based upon her review of the Debtor's file, Ms. Pulver testified that Debtor's payments on the outstanding Bank loans had been behind since the middle of 2005 and that from mid 2007, the loans were chronically past due. Ms. Pulver expressed the opinion that the proposed payout of the secured loan over 30 years at 5% annual interest was considerably below the parameters of customary lending practices. Based upon her experience in lending on what she characterized as a commercial, agricultural enterprise, Ms. Pulver testified that ten years might be considered short term, fifteen years might be average and that, occasionally, loans might go out for 20 years. Ms. Pulver was emphatic, however, that they would never be extended for a period of 30 years. Ms. Pulver further testified that 5% interest is far below what would be available on this kind of loan based upon the risk involved.

In evaluating the Plan, Ms. Pulver testified that when dealing with crop farmers and the feasibility of a proposal that has a retail component, one looks for specific details in a business plan that include a budget, a marketing plan and a history with some past track record, none of which is present here. In order to mitigate the risk of a single crop failing, Ms. Pulver further testified that other seasonal crops should be planted throughout the year. Crop insurance would also be required which Pulver did not believe was available for pumpkins. In Ms. Pulver's opinion, the proposed operation was more of a "hobby" farm for which the likelihood of obtaining a loan would be nil and that the enterprise and other proposed income would be insufficient to service the debt. The Bank introduced four alternative budgets (Exhibits A-D), all of which incorporated a $10,000 line item for repair and maintenance/upkeep costs of the property both on the

Debtor's terms and, alternatively, with secured Bank debt repaid over 15 years at 7% interest. The projections all yielded a negative cash flow and did not account for expenses of transportation, fuel, clothing or food. The $10,000 maintenance/upkeep allotment represents 1.7% of the Property value; Ms. Pulver testified that normally one would budget that annual cost at 3 to 4 per cent of property value.

OBJECTIONS TO CONFIRMATION

The Trustee objects to the feasibility of Debtor's Plan based upon the asserted inability of the Debtor to make the payments called for and the insufficiency of the payments to fund the Plan. The Trustee further alleges that the Debtor has failed to make any of the proposed plan payments to date.

NBT Bank asserts that the Debtor is ineligible for chapter 12 relief because on the date of filing the Debtor was not "engaged in a farming operation." NBT Bank further objects to the feasibility of Debtor's Plan. The Bank contends that the proposed repayment terms of its secured debt are unreasonable and inconsistent with customary lending practices. These arguments shall be separately considered.

*Eligibility for Seeking Chapter 12 Relief*

In pertinent part, the Code provides that only a "family farmer…with regular income" is eligible for chapter 12 relief. 11 U.S.C. § 109(f). "Family farmer with regular annual income" is defined as one "whose annual income is sufficiently stable and regular to enable such family farmer to make payments under a plan under chapter 12". 11 U.S.C. § 101(19). The statute further defines "family farmer" as:

> Individual or individual and spouse engaged in a farming operation whose aggregate debts do not exceed $3,792,650 and not less than 50 percent of whose

8

> aggregate noncontingent, liquidated debts..., on the date the case is filed, arise out of a farming operation owned or operated by such individual or such individual and spouse, and such individual or such individual and spouse receive from such farming operation more than 50 percent of such individual's or such individual and spouse's gross income for---
>     (i)    The taxable year preceding; or
>     (ii)   Each of the 2d and 3d taxable years preceding;
> the taxable year in which the case concerning such individual or such individual and spouse was filed;

11 U.S.C. § 101(18). The Debtor falls within the debt limit for chapter 12 and the characterization of not less than 50 percent of her debt as arising out of a "farming operation" on the date the case was filed. The court further finds that for each of the second and third taxable years preceding the Debtor's filing, more than 50 per cent of Debtor's gross income arose from a farming operation.

What the Bank takes issue with is whether the Debtor was physically engaged in a farming operation *on the date* the case was filed. Because the Debtor was struggling over at least a two year period pre-filing to regain her footing -- after forcibly surrendering her livestock and equipment and enduring the breakup of a 25 plus year marriage, her interim measures to survive by generating non-farm income should not, in the opinion of this court, be the yardstick for determining her eligibility status. Debtor's temporal interlude of working off farm arising from a forced displacement does not supplant her ongoing intention to continue farming to which she testified, nor should it foreclose under the circumstances presented her access to pursue a chapter 12 proceeding. Notwithstanding her schedules, Debtor testified that on the day of filing she owned two cows, a goat and some farm equipment consisting of a John Deere corn cultivator and tow behind John Deere disc. On the present record, the court concludes that the Debtor should not be

dismissed on eligibility grounds but that the merits of the Plan before the court should be considered.

*Feasibility of the Plan*

Pursuant to 11 U.S.C. § 1225(a)(6), the court shall confirm a plan, if the court, among other factors, finds that "the debtor will be able to make all payments under the plan and to comply with the plan." The Debtor has the burden to establish all of the elements essential to confirmation of the Plan. *In re Alvstad,* 223 B.R.733 (Bankr. D.N.D. 1998). Feasibility involves considerations of the probability of payment based upon a determination of reasonableness. "Feasibility, which depends on a determination of the reasonable probability of payment, is fundamentally a fact question. Resolution of feasibility necessarily entails a determination of the comparative credibility of experts, as well as the credibility of the debtor." *In re Tate,* 217 B.R. 518, 520 (Bankr. E.D. Tex. 1997), citing *In re Crowley,* 85 B.R. 76, 78-79 (Bankr. W.D.Wis. 1988).

The Debtor is a straightforward individual who is obviously well-intentioned and bent on saving the family farm that had been given to her by her grandmother. While apparently hardworking and capable of performing many labor-intensive tasks required of a farmer, she is one woman undertaking an entirely new venture to support payments under the proposed Plan. Notwithstanding the sincerity of her effort, the proposal is entirely speculative and raises serious questions as to whether she can actually achieve the targets she has set. Her comparatively modest harvest of two acres of pumpkins, first undertaken during the pendency of this proceeding, provides too little precedent to establish a track record predictive of success for the much larger and different venture proposed. As such, a strong record of independent evidence was required to shore up her

projections and prove through a detailed, written business plan that her projections are sound. And yet, the record consists of solely her oral testimony. There was no additional, independent evidence introduce to properly document the *net* revenue to be realized from the pumpkin operation and the mitigation of risks to firmly establish by a reasonable probability that a steady stream of income would be forthcoming to support the proposed payments under the Plan. There was no independent evidence introduced to support the income projections predicted from this new venture.

Furthermore, wholly lacking is reliable evidence of plan funding coming from the neighbor's payments for water use. No written agreement was produced as to terms agreed upon nor evidence of the third party's willingness and wherewithal to comply. This evidence was crucial as an essential component of the proposed funding, particularly since the Debtor has not paid 2011 school and 2012 real estate taxes which become liens against the Property and accrue interest at 12 per cent under applicable nonbankruptcy law. 11 U.S.C. § 511(a). The only written document regarding the proposed sale of Residence 2 was an expired listing agreement.(Ex. 17). Further, the testimony reflected discrepancies in the full reporting of income on the Debtor's tax returns. As the Debtor's actual, reported income increases, two additional sources for funding the Debtor's expenses and plan payments are likely to disappear: 1) Debtor's eligibility to qualify for and receive food stamps; and 2) the likelihood of Debtor's continued receipt of tax refunds at the projected level. Based upon the record, the court concludes that the Debtor has not carried her burden of establishing the Plan's feasibility under 11 U.S.C. § 1225(a)(6).

The court also accepts the testimony of Ms. Pulver, the only expert witness presented, in concluding that neither the term of years proposed (30) nor the interest rate (5%) at which the secured claim of NBT Bank is proposed to be paid is reasonable nor in line with customary lending practices. For the speculative nature of the commercial business venture proposed, the interest rate does not properly take into account the risk of nonpayment to NBT Bank. The original loans, as pointed out by the Bank, provided a maximum term of ten years and involved a more predictable operation of dairy farming. Accordingly, the Debtor's plan must also fail under 11 U.S.C. § 1225(a)(5).

The Trustee's objection of April 18, 2012 also asserts that as of 14 months into the case, the Trustee had not received any payments from the Debtor. Yet, the Debtor received rental income and pumpkin income[4] which was not reported on the Debtor's tax return and did not disburse to the Trustee $5,000 of the Debtor's 2011 tax refund (which totaled $8,408) as called for under the terms of the Plan. It was not until the evidentiary hearing that the Debtor disclosed that it was going to request of the Trustee that she be allowed to utilize money from the tax refund to outlay additional funds for the pumpkin operation. As the testimony unfolded, there were additional, hidden costs which the Debtor had not taken into account. The Debtor's case has now been pending under chapter 12 for over a year and the terms for conducting the farming operation have constantly shifted. Based on the fact that the $1,000 monthly adequate protection payment to NBT Bank, supplemented by payment of the $4,000 received by the Debtor for harvesting pumpkins, is significantly lower than the interest accruing on NBT Bank's debt utilizing the interest rate proposed by the Debtor, coupled with the inability to pay

---

[4] The pumpkin income was paid over to NBT Bank.

12

ongoing real estate taxes and to make any payments to the Trustee, the court concludes that the Debtor is without sufficient monies to fund the Plan now or going forward.

### NBT BANK'S STAY RELIEF MOTION

NBT Bank brought its request for relief from the automatic stay as to the Property pursuant to 11 U.S.C. §§ 362(d)(1) and (2). Pursuant to section 362(d)(1), the court may grant stay relief "for cause, including the lack of adequate protection of an interest in property." 11 U.S.C. § 362(d)(1). Pursuant to section 362(d)(2), the court may grant stay relief with respect to property where "(A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization." 11 U.S.C. § 362(d)(2). The court finds sufficient grounds to grant NBT Bank's stay relief motion under both sections.

#### *Stay Relief Under Section 362(d)(1)*

Where a secured creditor lacks adequate protection from the postpetition decline in the value of its collateral, such creditor is entitled to relief from the automatic stay. 11 U.S.C. § 362(d)(1). The debtor bears the burden of proving that the creditor's interest in the collateral is adequately protected. 11 U.S.C. § 362(g)(2). NBT Bank is a secured creditor. NBT Bank holds duly perfected liens in the Property and, as previously stated, the Debtor and NBT Bank have stipulated that NBT Bank is secured to the extent of $576,622.54.

The Debtor has failed to show that NBT Bank's interest in the Property is adequately protected and the court finds that NBT lacks adequate protection. Although the court entered two interim orders directing Debtor to make monthly adequate

13

protection payments of $1,000 to NBT Bank, this is far below the interest at the rate proposed to be paid by the Debtor on NBT Bank's secured claim, which equals approximately $28,831.13 per year, or $2,402.59 per month. The orders were not a conclusive determination of the appropriate level of payments NBT Bank was entitled to for adequate protection of its interest in the Property. Rather, the orders were entered with the consent of NBT Bank to facilitate negotiations between the parties to construct a feasible and confirmable plan. Having already concluded that Debtor is without sufficient monies to fund a plan, the court also determines that NBT Bank's security interest in the Property is not adequately protected, and that NBT Bank is entitled to stay relief pursuant to 11 U.S.C. § 362(d)(1).

### *Stay Relief Under Section 362(d)(2)*

Where the debtor has no equity in a secured creditor's collateral, and there is no reasonable possibility of a successful reorganization within a reasonable time, such secured creditor is entitled to relief from the automatic stay. 11 U.S.C. § 362(d)(2); *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375-376 (1988). The debtor bears the burden of proving that there is a reasonable possibility of a successful reorganization within a reasonable time. 11 U.S.C. § 362(g)(2). Debtor has no equity in the Property. In addition to the stipulated amount of $576,622.54 for NBT Bank's security interest in the Property, the Property is also encumbered by the Farm Service Agency's mortgage balance of $39,547.17 and the outstanding taxes. However, Debtor's own schedule A lists the value of the Property at $433,200.00.

Additionally, there is no reasonable possibility of a successful reorganization within a reasonable time. 11 U.S.C. § 1224 states that "[e]xcept for cause, the

[confirmation] hearing shall be concluded not later than 45 days after the filing of the plan." Debtor filed her amended chapter 12 plan on July 29, 2011, and only through the indulgence of NBT Bank did the court extend the confirmation hearing on Debtor's amended plan for nearly a year. Debtor had more than a reasonable amount of time to construct a confirmable plan necessary for a successful reorganization, yet no such confirmable plan has been presented to the court. Debtor has therefore failed to show that there is a reasonable possibility of a confirmable plan in the near future. Because there is no reasonable possibility for Debtor's successful reorganization within a reasonable time, NBT Bank is also entitled to stay relief pursuant to 11 U.S.C. § 362(d)(2).

Accordingly, the court grants NBT's motion for relief from the automatic stay. The Debtor shall be afforded the benefit of the fourteen-day stay provided by Fed. R. Bankr. P. 4001(a)(3) to consider further any consensual resolution that may be reached with NBT Bank.

So Ordered.

Dated: July 3, 2012
Syracuse, New York

Margaret Cangilos-Ruiz
United States Bankruptcy Judge

15